Charles F. Peterson ISB# 3346
PETERSON LAWYERS
671 E. Riverpark Lane, Suite 210
Boise, Idaho 83706
Telephone (208) 342-4633
FAX (208) 955-2020
chuck@petersonlawyers.com

*Attorney for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH ALAN HOADLEY,<br><br>Defendant. | Case No. 22-cr-00056-SWS<br><br>**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE, FOR NEW TRIAL** |

After the United States closed its case-in-chief on September 21, 2022, Mr. Hoadley moved the Court to grant judgment of acquittal, asserting the government offered insufficient evidence to prove Counts 1 through 4 beyond a reasonable doubt. The Court denied this motion, and on September 24, 2022, Mr. Hoadley was convicted of Counts 2, 3, and 4 as charged in the Second Superseding Indictment. Pursuant to Federal Criminal Rule 29, Mr. Hoadley now renews his motion for judgment of acquittal for insufficiency of evidence to support the convictions.

## I.    Background

Evidence of the following facts was offered at trial. Until early 2022, Mr. Hoadley worked as a lieutenant with the Caldwell Police Department (CPD), and by virtue of this position, he supervised many officers within the CPD. Mr. Hoadley's supervisory tasks included

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 1**

performance evaluations and administrative duties, but he often assisted officers responding to calls that warranted a larger law enforcement presence on the scene.

On March 30, 2017, Mr. Hoadley participated in the detention and arrest of B.H., who was later convicted for felony drug possession with intent to deliver due to that day's events. CPD responded to B.H.'s residence to investigate a 911 hang-up call from a landline telephone. Mr. Hoadley assisted in the response to this call, which was assigned to Officer Amber Walker, because Walker learned a 911 call had been made from the address a few days before March 30. The previous caller stated she and others living at the address were being threatened with violence, so Walker and other CPD officers recognized a larger and more robust police response was warranted under the circumstances of the March 30 hang-up call to 911. Although Mr. Hoadley was not wearing a body camera during this arrest, patrol officers Walker and Ben Heinrich wore body cameras that documented the response to B.H.'s home.

Upon arriving at B.H.'s residence, knocking on the front door, and receiving no response, Walker and Mr. Hoadley went through a gate into the backyard to attempt to contact the residents inside and ascertain if they were in danger. Mr. Hoadley contacted B.H.'s minor son as he approached the back door, and he and Walker entered the residence to check on the safety of B.H.'s elderly mother, the owner of the home. Almost immediately, Mr. Hoadley commented that the home smelled strongly of marijuana. Moments after Walker and Mr. Hoadley contacted B.H.'s mother, Officer Heinrich and Sergeant Adam Matthews entered the home, located B.H. in the basement, and ordered him to come upstairs and sit in the front room while they conducted a protective sweep of the residence.

As documented by Walker's body camera, B.H. repeatedly complained about the officers' presence in his home and suggested their entry was not lawful. Walker and Mr. Hoadley

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 2**

made several attempts to de-escalate the situation by using calm tones of voice, explaining the prior 911 call that warranted their welfare check, and contacting dispatch to ensure the 911 hang-up call originated from B.H.'s address. Mr. Hoadley also attempted to resolve the marijuana odor issue in a non-confrontational way by telling B.H. he could produce the marijuana, receive a citation, and the officers could leave B.H. to go about his day. None of these de-escalation efforts calmed B.H., who remained upset that CPD officers were in his home.

B.H. stated multiple times to Mr. Hoadley and Walker that no marijuana was in the home. As B.H. admitted on the stand, these statements were lies. In fact, approximately five pounds of marijuana was discovered in plain view by the CPD officers in the basement while they conducted their protective sweep. These officers told Mr. Hoadley about the marijuana by radio, Mr. Hoadley asked if they wanted him to detain B.H., and Mr. Hoadley and Walker then detained B.H. in handcuffs and advised him and his family members of their Miranda rights. B.H. continued to verbally challenge the officers, so Mr. Hoadley opted to take B.H. from the home to a patrol vehicle to avoid the situation from escalating further.

When Mr. Hoadley and B.H. exited the home, Walker closed the door behind them and remained inside to speak with B.H.'s mother and son. Officer Eduardo Ibarra was present outside B.H.'s home, but he was not wearing a body camera. Mr. Hoadley, B.H., and Ibarra offered different accounts of what happened outside the home, but all accounts agreed that Mr. Hoadley used some force to take B.H. down to the ground. Walker exited the home seconds after B.H. was brought to the ground, and her body camera captured Mr. Hoadley telling B.H. to stop trying to escape. The video also documented B.H. complaining that he had been struck in the face, which Mr. Hoadley immediately denied.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 3**

The encounter with B.H. ended when Mr. Hoadley and Ibarra helped B.H. to his feet and escorted him to the police car. Walker's body camera shows B.H. pulling against the officers and continuing to complain about his rights being violated, as he had earlier done within the home.

Mr. Hoadley then documented in a narrative report the events that occurred during B.H.'s arrest. In this approximately one-and-a-half page report, Mr. Hoadley described numerous facts and events that occurred.[1] The portion of Mr. Hoadley's report that is alleged to be false reads as follows:

> We ceased our questioning of [B.H.], however, he continued to talk and ask questions and challenge the authority of the officers. At this time, I detained [B.H.] in handcuffs and escorted him out of the living room and into the front yard. While doing so, [B.H.] began to get aggressive. I felt his forearms tense up while escorting him to an awaiting police car just before he attempted to pull away from me. I kept ahold of his left arm and continued escorting him towards the roadway. [B.H.] again pulled away even harder at which time I believed he was attempting to escape. I used my left hand to force him to the ground by his shirt collar.
>
> Once on the ground, I ordered [B.H.] to stop trying to fight and escape from officers. He was assisted back to his feet before being placed in the back of Ofc. George's patrol car.[2]

Ibarra and Matthews did not write narrative reports documenting the incident, but the other responding officers did.[3] Walker did not mention in her report that B.H. complained about

---

[1] *See infra* note 2. Among the portions of his report relevant to the false records charge, Mr. Hoadley reported the following: (1) Mr. Hoadley responded to assist Walker with a 911 hang-up call after being alerted over the radio about the previous call reporting threats to kill the calling party and her family; (2) Walker attempted to knock on the door for several minutes without receiving an answer; (3) Walker entered the back yard through an unlocked gate and let Mr. Hoadley in through another gate into the back yard; (4) Mr. Hoadley noticed the side door to the residence was ajar before making contact with B.H.'s son; (5) Mr. Hoadley immediately noticed a strong smell of marijuana inside the home; (6) B.H. was called up from the basement by Sergeant Matthews; (7) officers conducted a protective sweep due to the suspicious circumstances; (8) B.H. argued with the officers and stated he did not believe a 911 call had originated from the house; (9) B.H. invoked his right to an attorney after Mr. Hoadley asked him about marijuana in the home; (10) Mr. Hoadley detained B.H. in handcuffs and took him into the front yard; (11) B.H.'s forearms tensed up as he was escorted to a police car, B.H. tried to pull away from Mr. Hoadley twice, and Mr. Hoadley believed he was attempting to escape; (12) Mr. Hoadley used his left hand to force B.H. to the ground by his shirt collar; (13) Mr. Hoadley ordered B.H. to stop trying to escape; (14) B.H. was brought back to his feet and successfully escorted to the police vehicle; and (15) Mr. Hoadley had not checked out a body worn camera due to performing administrative duties at the time of the call.
[2] Government's Trial Exhibit 2001, p. 5 (Report of B.H. Arrest).
[3] *See id.*

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 4**

being struck, despite her body camera recording these complaints.[4] Her report simply stated that B.H. was detained and placed in a police vehicle, even though she witnessed the tail end of B.H. being taken to the ground to regain control of the situation.[5] Officer Jared George similarly observed the end of the struggle between B.H., Mr. Hoadley, and Ibarra, but he only stated B.H. was placed in his patrol vehicle by Mr. Hoadley and was already handcuffed at the time.[6] Heinrich likewise made no report that B.H. was physically brought to the ground during his walk to the patrol vehicle.[7]

The FBI began investigating the CPD in late 2020, and Mr. Hoadley was later indicted pursuant to 18 U.S.C. § 242 for allegedly using excessive force against B.H. during this arrest.[8] The government additionally claimed Mr. Hoadley's narrative report of the arrest was false in the following ways: (1) stating B.H. attempted to escape; (2) omitting reference Mr. Hoadley striking B.H.'s head and neck; and (3) implying the use of force was necessary to effectuate the arrest of B.H. and ensure officer safety.[9] The government alleged the report was false, because Mr. Hoadley knew he struck B.H. in the head and neck area and did not use his hand to force B.H. to the ground by his shirt collar.[10] The allegation that Mr. Hoadley falsely reported the circumstances of B.H.'s arrest constituted Count 2 under 18 U.S.C. § 1519, falsification of records in federal investigations.[11] Mr. Hoadley was later indicted for two additional counts under 18 U.S.C. § 1512.[12]

---

[4] *Id.*, p. 2-4. *See also* Government's Trial Exhibit 1001 (Walker Body Camera Video).
[5] Report of B.H. Arrest, p. 4.
[6] *Id.*, p. 6-7.
[7] *Id.*, p. 7-8.
[8] Docket 29, p. 1-2 (Second Superseding Indictment).
[9] *Id.*, p. 2.
[10] *Id.*
[11] *Id.*
[12] *Id.*, p. 3.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 5

On September 24, 2022, Mr. Hoadley was acquitted of Count 1 of the indictment but convicted of Counts 2, 3, and 4. Mr. Hoadley now renews his motion for judgment of acquittal for insufficiency of evidence, arguing that acquittal of Count 1 warrants a judgment of acquittal for Counts 2, 3, and 4.

## II.    Legal Standard

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. Pro. 29(c)(1). "Such a motion is reviewed for sufficiency of the evidence." *United States v. Williams*, No. 2:12-CR-463 JCM (VCF), 2016 U.S. Dist. LEXIS 49687, at *3 (D. Nev. Apr. 12, 2016) (citing *States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1988)). "The standard of review for determining the sufficiency of the evidence 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Although inconsistent verdicts may stand, the government must still present sufficient evidence of each charge to support a guilty verdict. *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012).

## III.    Argument

A.  There is insufficient evidence to convict Mr. Hoadley under Count 2, because (1) no reasonable juror could find Mr. Hoadley acted with the intent to impede a federal investigation if he did not use excessive force against B.H., and (2) the government did not offer evidence that could prove beyond a reasonable doubt that Mr. Hoadley's report was false.

First, all the government's evidence of intent under Count 2 was tied to its argument that Mr. Hoadley used excessive force against B.H. as charged in Count 1 and omitted this

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 6**

information in his report. An omission made with the requisite mental state satisfies the element

of falsity under § 1519. *United States v. Singh*, 979 F.3d 697, 716 (9th Cir. 2020). The

government's failure to prove beyond a reasonable doubt that Mr. Hoadley used excessive force

against B.H. directly calls into question the government's own theory of the mens rea for Count

2, being that Mr. Hoadley knowingly falsified an entry to avoid investigation and proper

administration of his use of force against B.H. The Court itself noted during its consideration of

the first motion for judgment of acquittal that Counts 1 and 2 are factually linked. No reasonable

juror could find beyond a reasonable doubt that Mr. Hoadley had the intent to impede a

contemplated investigation into a use of excessive force if there is reasonable doubt that Mr.

Hoadley used excessive force.

      Even if the jury acquitted Mr. Hoadley for lack of willfulness rather than believing Mr.

Hoadley used objectively reasonable force, this still creates reasonable doubt for the intent

element of Count 2. If Mr. Hoadley did not intend to use excessive force during his encounter

with B.H., no reasonable juror could believe Mr. Hoadley intentionally falsified a report of this

incident with the intent to impede a future investigation into his non-criminal use of force. If Mr.

Hoadley did not act willfully under Count 1, then any omission or false statement in his report of

the incident could only reasonably be attributed to mistake, negligence, or accident (which itself

is insufficient to find a defendant acted "knowingly" under § 1519), rather than a purposeful

omission to impede a future federal investigation.[13]

      As the jury acquitted Mr. Hoadley of using excessive force against B.H. in violation of §

242, there is insufficient evidence for any rational juror to find Mr. Hoadley had the intent

element required for a valid conviction under Count 2. This is true regardless of whether Mr.

---

[13] *See* Docket 85, p. 27 (Jury Instructions) ("An act is done 'knowingly' if the defendant is aware of the act and does not act through ignorance, mistake, or accident.").

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 7**

Hoadley was acquitted of Count 1 for using objectively reasonable force or for lacking the willfulness *mens rea* element.

The government did not offer sufficient evidence that the report was false, which is an essential element under § 1519. In its indictment and argument at trial, the government claimed the report was false by falsely stating B.H. attempted to escape, falsely omitting reference to Mr. Hoadley striking B.H., falsely omitting B.H.'s complaints that his constitutional rights were violated, and falsely implying the force used by Mr. Hoadley was necessary to arrest B.H. and ensure officer safety. The government failed to offer evidence that could allow any reasonable juror to find these falsities existed beyond a reasonable doubt, so acquittal under Count 2 is required.

As to the first alleged falsity, Mr. Hoadley's report stated his *belief* was that B.H. was attempting to escape, because he felt his forearms tense up and felt B.H. pull away twice. Mr. Hoadley did not definitively state in his report that B.H. was attempting to escape, as alleged in the indictment. The government did not offer evidence at trial to show Mr. Hoadley's stated belief was false under the circumstances, and the government's own expert witness acknowledged a suspect tensing up may create a reasonable believe that they are attempting escape. Even though B.H. claimed he was not trying to escape, this does not bear on whether Mr. Hoadley's reported belief – based on his observations and experiences – was false. In short, there is insufficient evidence to show that Mr. Hoadley's statement that he believed B.H. was trying to escape was a false statement made with the intent to impede a contemplated investigation.

There is also insufficient evidence to show Mr. Hoadley struck B.H., which must be proven beyond a reasonable doubt for Mr. Hoadley to be convicted of falsely omitting reference to such an act in a police report. The government's indictment expressly tied the falsity of Mr.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 8**

Hoadley's report to the allegation of excessive force.[14] A jury could not find beyond a reasonable doubt that Mr. Hoadley struck B.H. in the head and neck while handcuffed if Mr. Hoadley was acquitted on Count 1 for this alleged act. The issues with B.H.'s credibility and Ibarra's admission that he did not observe Mr. Hoadley strike B.H. create additional reasonable doubt as to whether excessive force was inflicted on B.H., as reflected in his acquittal under Count 1. The reasonable doubt for Count 1 directly creates reasonable doubt as to the falsity element of Count 2. Since the government failed to prove beyond a reasonable doubt that Mr. Hoadley used excessive force, no reasonable jury can find beyond a reasonable doubt Mr. Hoadley's report of this incident omitting a description of excessive force was proven to be false beyond a reasonable doubt.

Third, at trial the government pivoted from its reasoning under the indictment in its closing arguments, arguing Mr. Hoadley should be convicted under § 1519 for failing to document B.H.'s verbal complaints that his rights were violated. Courts have recognized omissions in a record may lead to conviction under § 1519, but generally such convictions require a duty to report or responsibility for the record. *See Singh*, 979 F.3d at 717 (noting in most cases where courts affirmed § 1519 convictions based on omissions, the defendant was "responsible for the report at issue" or "had a legal duty to disclose certain information in his report") (citing *United States v. Taohim*, 529 F. App'x 969, 974 n.2 (11th Cir. 2013); *United States v. Moyer*, 674 F.3d 192, 207 (3d Cir. 2012)).

Mr. Hoadley could certainly not be required to report acts that did not occur. Similarly, Officer Walker and Mr. Hoadley both testified that the CPD policy did not require a supplementary use of force documentation beyond the general report that did describe the force

---

[14] Second Superseding Indictment, p. 2.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 9**

used by Mr. Hoadley to regain control of B.H. The government offered no witnesses to challenge

this testimony. Walker and Mr. Hoadley both testified that Walker was the one responsible for

generating the reports of the incident with B.H. as the assigned responding officer, and the

government offered no evidence to rebut this testimony. The government failed to offer evidence

establishing Mr. Hoadley was required under CPD policy or under the law to log B.H.'s

complaints, especially given they were documented in the body camera video uploaded by

Amber Walker, the assigned responding officer. Therefore, Mr. Hoadley cannot be convicted

under § 1519 for this alleged omission, because there is insufficient evidence to show he had a

duty to document B.H.'s complaints or file a supplemental use of force report.

Neither is there any proof of a "pending federal investigation" or that there was, at the

time of his officer report on or about March 30, 2017, any intended federal investigation related

to B.H. or the events of March 30, 2017. The evidence at trial established that there was no

investigation of any wrongdoing by Mr. Hoadley until December of 2020, over three and a half

years after the report that is the basis for Count 2. In short, the finding of guilt to Count 2 is

completely lacking in proof beyond a reasonable doubt that any action by Hoadley was

substantial or intended to impede or obstruct a federal investigation.[15]

As for the final alleged falsity charged in the indictment, Mr. Hoadley neither referenced

officer safety nor characterized his force within the report of the incident as "necessary" to

ensure officer safety or effectuate the arrest of B.H. There was simply no evidence within the

report itself or presented at trial to show beyond a reasonable doubt that this "implication" is a

false statement for which Mr. Hoadley could be justifiably prosecuted.

---

[15] See, Jury Instruction 24, para. 4, "…However, the government must prove beyond a reasonable doubt that the
defendant's intention to impeded or obstruct a federal investigation was substantial." There simply was no federal
investigation in March or April 2017 to impeded or obstruct.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW
TRIAL – 10**

B.  There is insufficient evidence to convict Mr. Hoadley under Count 3, because (1) no reasonable juror could find Mr. Hoadley intentionally harassed C.H., (2) or that he attempted to hinder, delay, or dissuade C.H. from reporting to a law enforcement officer the commission or possible commission of a federal offense.

The evidence at trial established that C.H. met with Bendawald and Hoadley on June 30, 2021. By then, the fact that there was an investigation was well known within the department. It was common knowledge that CPD officers, and others had been interviewed by the FBI. As Hoadley testified, the meeting was an attempt to mediate the strained relationship between C.H. and Bendawald, as well as between the Street Crimes Unit and the City County Narcotics Unit. As both Bendawald and C.H.'s superior officer and supervisor, Hoadley's duties included handling these types of employee issues. In fact, as C.H. testified, he left the meeting and went to the City Human Resources department to determine what steps he might take next relative to his career.

On July 1, 2021, C.H. reported to Captain Riley the discussion of workplace issues which had been addressed in the meeting with Bendawald and Hoadley.[16]  While he may not have believed Hoadley could serve as a neutral mediator, C.H. outlined specific employment issues. Bendawald said he thought that C.H. was snubbing him, and "going around him" by providing information to another member of the Street Crimes Unit. Bendawald brought up a discussion regarding the arrest of a Michael Udan on an indictment and warrant. C.H. had told Jonathon Hoadley (not the defendant) that CPD officers could not cross into County jurisdiction to make the arrest. Joey Hoadley told C.H. that a memorandum of understanding permitted CPD officers to make such an arrest, a fact that Chief Wyant confirmed when he walked into the room in which the meeting was being held. Bendawald said that C.H. had been condescending to Hoadley and had hung up on a phone call.

---

[16] Government's Trial Exhibit 3002.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 11**

Even if, as C.H. reported, Hoadley and Bendawald "brought up" the FBI investigation and suggested that C.H. was acting disrespectfully toward them as a result, such comments could hardly be considered harassment. The Court did not instruct on the term, but its common meaning means "to disturb or bother persistently; torment, as with troubles or cares; pester."[17] A secondary definition includes "to intimidate or coerce, as with persistent demands or threats."

By his own report of the meeting to Captain Riley, the only comment that could have been interpreted as threatening to C.H.'s employment was the suggestion that C.H. look at the patch on his shoulder. Hoadley explained that he meant only that C.H. worked for CPD, and that Hoadley was his supervisor. As for the rest of the meeting, as detailed to Captain Riley, the discussion concerned the job that C.H. was doing in the narcotics unit, not his interaction in the FBI investigation. As he described the end result of that meeting and his assessment of its impact on his career, C.H. reported: "I am content that Captain Riley assured me that both he and Chief Wyant are pleased with the work I am doing at the CCNU and that my position in the unit is not in jeopardy, regardless of how I was left feeling after the conversation with Lt Hoadley."[18]

Three points are important here. First, the government's evidence did not include any express or implied attempt on Hoadley's part to hinder, delay, or dissuade C.H. from reporting to a law enforcement officer the commission or possible commission of a federal offense. At best, according to C.H.'s report of the incident, he feared a negative performance evaluation or retaliation in the workplace. Reminding a police officer that he works for the City is not an expressed or implicit threat to keep him from reporting information concerning a federal offense. And what would that federal offense have been? That four years earlier Joe Cardwell told C.H. Hoadley had shown him a video in which it appeared he had used excessive force? C.H.

---

[17] *See*, Dictionary.com.
[18] Government's Trial Exhibit 3002.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 12**

ultimately denied seeing any such video when questioned by the FBI. Whatever information he had about Hoadley had almost certainly already been disclosed, and nothing Hoadley said would have indicated any intention to keep C.H. from interacting with the FBI.

Second, the government's evidence consists of a single meeting in which Hoadley reminded C.H. that the FBI's investigation was not a finding of guilt. Hoadley's reminder that he and Bendawald were presumed innocent, was not harassment. It was the truth. Even the "patch on your shoulder" comment was no call to action or attempt to prevent C.H. from reporting conduct to the FBI. Hoadley was his superior officer, his supervisor, and his performance evaluator.

Hoadley's report of the job performance and employment issues he had with C.H. were outlined in Defendant's Exhibit 5062. They include information provided by Detective Roman as to C.H.'s poor duty performance and comparison of the work statistics between Roman and C.H. If C.H. feared for his employment and assignment to CCNU, those fears had nothing to do with the FBI investigation. In simplest terms, C.H. was not performing as might be expected from an officer with his experience and time in service.

Finally, the term "harassment" implies a "persistent threat" or "demand." The government offered no evidence of any other occasion with C.H. in which he claimed his work assignment or career was threatened, or any demand made by Hoadley or Bendawald that he not cooperate with the FBI investigation. C.H. would have reported such an attempt to keep him from being involved with the investigation in his report to Captain Riley, and he did not do so. Instead, C.H. said: "I am content that Captain Riley assured me that both he and Chief Wyatt are

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 13**

pleased with the work I am doing at the CC and you and that my position in the unit is not in

jeopardy, regardless of how I was left feeling after the conversation with LT Hoadley."[19]

There is not sufficient evidence from which a reasonable juror could have found Mr. Hoadley

guilty of Count 3 beyond a reasonable doubt.

> C.  There is insufficient evidence to convict Mr. Hoadley under Count 4, because (1) no
>     reasonable juror could find Mr. altered, destroyed, mutilated, or concealed a record,
>     document, or other object or attempted to do so., (2) or that he acted corruptly, (3) or
>     that he intended to impair the integrity or availability of a record, document, or other
>     object for use in an official proceeding.

There are three problems with the government's proof regarding the cell phone and the

laptop computer. First, Mr. Hoadley, who had been on administrative leave since January of

2022, had no reason to believe that he was not permitted to reset the iPhone or the MacBook. His

intention to keep personal information off the iPhone and MacBook was reasonable under the

circumstances on April 21, 2022. Second, Hoadley had been involved in the return of property

by Eduardo Ibarra and had seen directions in that situation for Ibarra to not delete any files or

information. There, Ibarra's location was proven by the GPS location data on the electronics. For

Hoadley, who had already been charged with use of excessive force and falsely reporting the

Hoobery incident, there would have been no reason to suspect that the government or the City

believed evidence of those charges was on his electronics. Finally, there is no proof that the files

on either were altered, destroyed, mutilated, or concealed. The only witness called by the

government on this issue testified that the information might be on the devices, but the City did

not have the software to know whether it was or not.

Mr. Hoadley was advised by Alyssa Battaglia's letter dated April 20, 2022 to turn in his

City issued items.[20] The instruction indicated he was on paid administrative leave "not due to

---

[19] Government's Trial Exhibit 3002, p. 3.
[20] Defendant's Trial Exhibit 5024.

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW
TRIAL – 14**

disciplinary action….” In contrast, Hoadley had delivered a similar request to Eduardo Ibarra
from Frank Wyant, Chief of Police, when notified Ibarra was being terminated from CPD. In that
letter Ibarra was directed to not access any “City computer, computer system, network resource
or application (however characterized) or remove, erase or alter any documents or other City
property (excluding only your personal effects unconnected with City operations) from any City
facility.”[21] Ibarra was being fired for disciplinary reasons at the time the return of property was
demanded, Hoadley was not. The evidence does not indicate that anyone told him he could not
reset the iPhone or the MacBook, and as he testified, he did so because he believed each would
be reissued to another officer and each would be reset before being reissued.

      The government did not serve a subpoena on Mr. Hoadley for either the iPhone or the
MacBook. The City had not made any earlier demand for return of either. Mr. Hoadley had not
been permitted to perform any work-related duties while on administrative leave, and there is no
proof as to what, if anything related to any criminal investigation was recorded in any file on the
iPhone or MacBook. If the government was looking for that “mystery video” that was
supposedly shown to Joe Cardwell, the iPhone that was located in Hoadley's office with
information earlier than 2019, would more likely have had such proof, if it had existed.[22]

      The government's evidence also indicated that Hoadley's office desktop computer was
locked down and information unavailable to him even after LT Dave Wright accompanied him to
his office to attempt to retrieve information for use at trial. Hoadley testified that he believed his
iPhone and MacBook were backed up on City servers, and he believed the information was still
available. The government's technology witness, the Caldwell City IT director Jose Menchaca

---

[21] Defendant's Trial Exhibit 5031.
[22] See, Government's Trial Exhibit 1023, which contains an Extraction Report for hat iPhone and demonstrates a shared account, and text message between Hoadley's ex-wife and her sister (Zamora).

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 15**

confirmed the City used servers, was unable to tell if the iPhone or MacBook was backed up on the servers, and admitted that the data might still be on both electronics but the City did not have the software to determine if that was the case. Menchaca testified that to retrieve data that might have been erased, he would need forensic tools the City did not have.

The government offered no evidence to substantiate anything of evidentiary value on either. There is not proof beyond a reasonable doubt that Hoadley acted corruptly when he reset the iPhone and MacBook or that he intended to impair the integrity or availability of either for use in an official proceeding. The official proceeding, he knew of, included Counts 1 and 2 on which he had already been indicted.

### IV.    Conclusion

Mr. Hoadley's acquittal under Count 1 warrants a judgment of acquittal for Count 2. Although inconsistent verdicts do not mandate the Court to order an acquittal, these two charges are factually connected such that reasonable doubt in Count 1 creates reasonable doubt in Count 2. No reasonable juror could find Mr. Hoadley used objectively reasonable force or failed to act willfully and simultaneously find beyond a reasonable doubt that he falsified a report of his encounter with B.H. to impair a future federal investigation. Consequently, the government failed to produce sufficient evidence to maintain a conviction under Count 2, and Mr. Hoadley respectfully requests the Court grant his motion for judgment of acquittal.

With respect to Counts 3 and 4, no reasonable juror could have found Mr. Hoadley was guilty of either beyond a reasonable doubt. There was no evidence that Hoadley harassed C.H., and the evidence produced by the government established the C.H. thought of the matters discussed at the meeting as employment related. Even if C.H. believed he faced an employment related discipline during that meeting, there was no evidence of any effort by Hoadley to

dissuade C.H. from taking action related to reporting any crime. Likewise, that single meeting did not amount to harassment by Hoadley, who had supervisory duties over C.H. Hoadley took no action as to C.H., nor did he direct or imply that C.H. should not report or refuse to cooperate with the FBI investigation.

As to Count 4, there is no proof that that Hoadley destroyed any record to impair its use in an official proceeding. His instructions for return of the property did not prohibit him from resetting the electronics, and the government's technology witness could not say whether the records on the iPhone or MacBook were recoverable with software they did not have, but the FBI lab certainly did.

For these reasons, Judgment of Acquittal should be granted on Counts 2, 3, and 4.

In the alternative, Mr. Hoadley moves the Court, in the interest of justice, to grant him a new trial pursuant to Federal Rule of Criminal Procedure 33. Within a week before starting the trial of the case, the government disclosed some 340,000 bates stamped documents to the defendant. Document disclosures continued throughout the trial. The government had all these documents a month or more prior to the trial but simply chose to place Mr. Hoadley at the disadvantage of going forward without fully knowing whether there was favorable or unfavorable evidence within the disclosures. As of this date, review of the late disclosed documents continues. It is no answer that the government could not use the documents at the trial. The government had, or could have had the documents and could have started the Garrity review sooner. That Mr. Hoadley did not want to delay his trial should not be held against him under these circumstances.

//s//_____
Charles F. Peterson
Attorney for Defendant

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 17**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 6th day of October 2022, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by email:

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
Katherine L. Horwitz
Assistant United States Attorney
Kate.horwitz@usdoj.gov
Francis J. Zebari
Assistant United States Attorney
Frank.Zebari@usdoj.gov

//s//_____
Charles F. Peterson

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL – 18**