UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>JOSEPH ALAN HOADLEY,<br><br>        Defendant. | Case No. 1:22-CR-00056-SWS<br><br>**ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL** |

This matter comes before the Court on the Defendant's Renewed Motion for Judgment of Acquittal or in the Alternative, for New Trial (ECF 95). The Government responded (ECF 108), and Mr. Hoadley replied (ECF 111). Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court denies the motion.

## BACKGROUND

In a second superseding indictment, a grand jury indicted Mr. Hoadley, a former lieutenant with the Caldwell Police Department (CPD), on one count of willfully depriving another person of their rights under color of law (Count 1), one count of falsifying records in a federal investigation (Count 2), one count of witness tampering (Count 3), and one count of evidence tampering (Count 4). (ECF 29.)

### Counts 1 and 2

The first two charges were based around an event that occurred during the afternoon of March 30, 2017, and involved the arrest of B.H. (*See* Trial Ex. 1001 (Officer Amber Walker's bodycam video of the incident).) Emergency dispatch received a 911 hang-up/disconnect call from

a residence in Caldwell that turned out to be B.H.'s residence. (Trial Tr. Vol. III 256:17-257:9[1].) Patrol Officer Amber Walker was the first to respond and reviewed the prior call history for the residence, which indicated a call had been placed from the same residence to 911 a few days prior reporting threats of violence by a male toward a female. (*Id.* 257:6-258:1.) On this occasion, six police officers in total responded to the residence. (*Id.* 259:7-11.) After receiving no response at the front door, Officer Walker and Mr. Hoadley tried the side door, where they made contact with a teenaged male who said he was home with his grandmother. (*Id.* 259:12-24, 261:8-20.) Mr. Hoadley and Officer Walker then entered the residence through the side door and followed the young male to the living room where his grandmother was sitting. (*Id.* 261:11-20, 262:11-15.) While inside the home, they smelled a strong odor of marijuana. (*Id.* 262:16-22.) After confirming the young male and grandmother were okay, Officer Walker conducted a security sweep of the rooms on the main floor of the residence, looking for anyone else who may need assistance. (*Id.* 262:23-264:5.) Two other officers were going to conduct the same security sweep of the lower level (basement) of the residence after the young man stated he wasn't sure if his father (B.H.) was home. (*Id.* 264:6-24, 272:24-274:8.) The two other officers called down the stairs to B.H., who eventually came upstairs and joined the others. (*Id.* 265:16-266:11.) While Officer Walker and Mr. Hoadley spoke to B.H., the teenaged male (B.H.'s son), and the grandmother (B.H.'s mother) in the living room, the two other officers conducted the security sweep of the basement, where they located several pounds of marijuana. (*Id.* 266:12- 268:1; Trial Tr. Vol. II 204:22-24[2].)

Throughout his interaction with police, B.H. repeatedly questioned how the police officers had entered the house, on what authority they responded to the residence, and expressed his doubt that a 911 hang-up/disconnect call had occurred. (Trial Tr. Vol. III 266:12-267:10, 267:22-268:13,

---

[1] ECF 103.
[2] ECF 102.

269:12-4, 275:12-22, 279:16-21, 281:11-16.)  After the marijuana was found in the basement, Mr.

Hoadley placed B.H. in handcuffs and eventually escorted him outside toward a police vehicle.

(*Id.* 268:2-3, 268:17-269:2, 269:7-11, 280:7-9, 281:23-282:2; Trial Tr. Vol. II 221:10-12.)

Officer Eduardo Ibarra was outside the house already and started walking toward them to

assist. (Trial Tr. Vol. II 221:13-16.)  B.H. was in handcuffs, Mr. Hoadley was on B.H.'s left side

and had ahold of his left arm, and Officer Ibarra was moving toward them to take B.H.'s right side

and right arm.  (*Id.* 221:18-22, 265:2-10.)  Officer Ibarra testified at trial that Mr. Hoadley then

told B.H. to stop resisting and struck B.H., knocking him to the ground.  (*Id.* 221:23-222:4, 266:5-

267:6.)  B.H. then accused Mr. Hoadley of punching him and said Officer Ibarra saw it.  (*Id.* 222:4-

6.)  Officer Ibarra testified that the strike surprised him because he did not witness any attempts

by B.H. to escape or resist and did not observe any prior verbal exchange between B.H. and Mr.

Hoadley.  (*Id.* 222:14-21.)

Officer Walker then exited the front door of the residence and approached Mr. Hoadley

and Officer Ibarra while B.H. was on the ground on the public sidewalk.  Mr. Hoadley is heard on

Officer Walker's bodycam video (Trial Ex. 1001) at that time saying, "Stop trying to escape.

Nobody punched you in the face."  The two proceeded to argue a bit about whether Mr. Hoadley

punched B.H. and whether B.H. was trying to escape before Mr. Hoadley and Officer Ibarra picked

B.H. off the ground.  B.H. again accused Mr. Hoadley of punching him in the face.  Mr. Hoadley

responded, "I knocked you down."  B.H. started physically struggling against the officers at that

point while continuing to complain that he was punched in the face, and the two officers walked

him the remaining distance to a patrol car and placed him in the backseat.

Afterward, Officer Hoadley wrote a report of the incident, which stated in relevant part:

> At this time, I detained [B.H.] in handcuffs and escorted him out of the living room
> and into the front yard.  While doing so, [B.H.] began to get aggressive.  I felt his

forearms tense up while escorting him to an awaiting police car just before he attempted to pull away from me. I kept ahold of his left arm and continued escorting him towards the roadway. [B.H.] again pulled away even harder at which time I believed he was attempting to escape. I used my left hand to force him to the ground by his shirt collar.

Once on the ground, I ordered [B.H.] to stop trying to fight and escape from officers. He was assisted back to his feet before being placed in the back of Ofc. George's patrol car.

(Trial Ex. 2001.)

The Government accused Mr. Hoadley in Count 1 of using unlawful and unreasonable force against B.H. by striking him in the head and neck area while B.H. was handcuffed. (ECF 29 pp. 1-2.) In Count 2, the Government alleged Mr. Hoadley falsified his report of the incident in an attempt to impede or evade a potential federal investigation into his use of force. (*Id.* p. 2.)

## Counts 3 and 4

The final two charges relate to events occurring several years later while Mr. Hoadley and other CPD officers were under federal investigation on various complaints, including unlawful use-of-force allegations. The FBI's investigation into Mr. Hoadley (and Sergeant Ryan Bendewald and other CPD officers) began in December 2020 when Detective Joseph Cardwell and another CPD officer made a report to the FBI. (Trial Tr. Vol. III 172:2-14, 249:24-250:18.) Detective Cardwell reported that in 2016 he had attended a conference in Spokane, Washington, along with Mr. Hoadley, Sergeant Bendewald, C.H., and others. (Trial Tr. Vol. I 182:12-184:24.[3]) These four officers (Hoadley, Bendewald, C.H., and Cardwell) met for drinks one evening during the conference. (*Id.* 185:9-15.) Detective Cardwell testified that while they sat at a table and socialized, Mr. Hoadley showed a video on his phone to C.H. and Sergeant Bendewald. (*Id.* 185:16-20.) Detective Cardwell asked what they just watched, and Mr. Hoadley seemed reluctant

---

[3] ECF 101.

to show him. (*Id.* 185:21-25.) Mr. Hoadley eventually relented and showed what appeared to be a bodycam video showing a restrained, compliant male being punched in the face by a police officer. (*Id.* 186:1-17.) Detective Cardwell asked who the officer was, and Mr. Hoadley responded, "Me." (*Id.* 187:16-19.) Detective Cardwell felt uncomfortable reporting this incident to his superiors, but eventually reported the video he had been shown to the FBI in December 2020, about four-and-a-half years later (*id.* 199:17-25, 200:17-201:9), which triggered the FBI's investigation and led to the charges in this case.

On June 28, 2021, the FBI informed the CPD chief of police that Mr. Hoadley was being referred to prosecutors for possible criminal prosecution. (Trial Tr. Vol. III 252:21-253:10.) The following day, Mr. Hoadley called a subordinate officer, C.H., into his office for a meeting. (*Id.* 16:1-25.) C.H. had been cooperating with the FBI during its investigation. (*Id.* 21:19-21, 36:2-8, 54:17-19, 59:1-60:2.) Sergeant Bendewald, a close friend of Mr. Hoadley's at the time who was also under investigation by the FBI, was present for the meeting, but Mr. Hoadley denied C.H.'s request to have one of C.H.'s direct supervisors also present for the meeting. (*Id.* 17:1-20, 19:13-17, 20:19-21:3, 30:12-21.) Mr. Hoadley accused C.H. of "acting a certain way towards Sergeant Bendewald because of the FBI investigation," referring to some alleged minor insubordination. (*Id.* 20:1-8; *see also id.* 40:16-20.) Mr. Hoadley also instructed C.H. that he needed to remember the patch on his sleeve was Caldwell Police Department. (*Id.* 20:10-18.) C.H. testified at trial he felt this meeting was actually "[a]n ambush" on him, and he felt his current position and potentially his career was at risk if he continued to cooperate with the FBI. (*Id.* 21:19-21, 58:3-9.) C.H. testified Mr. Hoadley told him to remember the patch on his shoulder in relation to the FBI investigation. (*Id.* 53:13-25.) C.H. understood the statement to mean that he needed to show loyalty to Mr. Hoadley and Sergeant Bendewald in regards to the FBI investigation. (*Id.* 54:9-19.)

C.H. did, however, continue to cooperate with the FBI. (*Id.* 36:15-38:5.) Count 3 charged Mr. Hoadley with tampering with a witness, C.H., by harassment.

Finally, Count 4 involved Mr. Hoadley resetting his department-issued cellphone and laptop computer before returning them to CPD. On April 19, 2022, Mr. Hoadley appeared for his arraignment in this case. (ECF 18.) On April 20, 2022, Mr. Hoadley was provided a letter requesting the return of several department-issued items, including an Apple laptop computer and an Apple iPhone. (Trial Tr. Vol. III 98:10-99:4.) Lieutenant David Wright provided the letter to Mr. Hoadley and called on the afternoon of April 20th to arrange to collect the items. (*Id.* 110:15-111:4.) During that phone conversation, Mr. Hoadley requested time to talk with his attorney about the property return request before taking any action and also said he wanted to wait until his son wasn't around if a police officer was going to show up to collect the property. (*Id.* 108:10-21.) Lt. Wright collected the items from Mr. Hoadley at his home the next morning, April 21, 2022. (*Id.* 111:5-112:13.) Lt. Wright immediately delivered the laptop to Jose Menchaca, the information technology (IT) director, who informed Lt. Wright later that day that the laptop had been "wiped," i.e., most of the existing data had been removed from it the prior evening. (*Id.* 112:20-114:13, 139:4-8, 158:6-160:18, 169:6-17.) The FBI computer forensic lab later tried to recover data from the laptop using forensic extraction software but found no user-specific data. (*Id.* 181:15-182:2.) And when Lt. Wright powered on the cellphone, he found it had been reset to its original factory settings, thereby deleting any data Mr. Hoadley had generated while he possessed the phone. (*Id.* 143:6-8, 143:21-25, 145:19-146:12.) The FBI computer forensic lab later tried to recover data from the phone using forensic extraction software but was unsuccessful. (*Id.* 181:5-15.) In Count 4, the Government alleged Mr. Hoadley's act of deleting the data on those devices by resetting them before turning them into Lt. Wright, and after being indicted in this case,

constituted evidence tampering.  (ECF 29 p. 3.)

At trial, Mr. Hoadley moved for a judgment of acquittal at the close of the Government's case-in-chief, which the Court denied.  Following trial, the jury acquitted Mr. Hoadley of Count 1 and convicted him of the final three charges.  (ECF 92.)  He now renews his motion for judgment of acquittal as to Counts 2 through 4 or, alternatively, asks for a new trial.

## DISCUSSION

The Court first considers Mr. Hoadley's request for a judgment of acquittal before turning to his alternative request of a new trial.

### 1.    Judgment of Acquittal

Rule 29 of the Federal Rules of Criminal Procedure requires the trial court to enter a judgment of acquittal on any charge for which the evidence presented by the Government is insufficient to sustain a conviction.  In evaluating the sufficiency of the evidence, the Court determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Saelee*, 51 F.4th 327, 346 (9th Cir. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

> As *Jackson* explained, this deferential standard of review protects the trier of fact's responsibility to resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from the evidence presented. [*Jackson*, 443 U.S. at 319.]  A reviewing court need not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318–19, 99 S.Ct. 2781 (internal quotation marks and citation omitted).  Rather, the reviewing court must respect the province of the trier of fact by considering all evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the prosecution. *Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *United States v. Alvarez–Valenzuela*, 231 F.3d 1198, 1201 (9th Cir. 2000).

*United States v. Stanton*, 501 F.3d 1093, 1099 (9th Cir. 2007).  The "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc).

### 1.1    Count 2 - Falsification of Records in Federal Investigation

In Count 2, Mr. Hoadley was charged with violating 18 U.S.C. § 1519, which makes it a crime to knowingly falsify or make a false entry in any record with the intent to impede, obstruct, or influence a federal investigation or contemplated investigation.  The Government's theory on Count 2 was that Mr. Hoadley falsified his report of the B.H. incident, particularly concerning his use of force against B.H.  The essential elements of this charge require the Government to prove beyond a reasonable doubt that Mr. Hoadley knowingly falsified a record or document with the intent to impede, obstruct, or influence an actual or contemplated federal investigation. (ECF 85 p. 26 (Jury Instr. 23)); 18 U.S.C. § 1519.

Viewing the evidence produced at trial in the prosecution's favor, the Court finds a rational trier of fact could find Mr. Hoadley guilty of Count 2.  Mr. Hoadley's report that he forced B.H. to the ground by B.H.'s shirt collar is different from his statement captured at the scene on Officer Amber Walker's bodycam that he "knocked" B.H. down.  The jury could rationally conclude this difference in description was substantive and was an attempt by Mr. Hoadley to downplay the force he used against B.H. to evade or influence any investigation into his use of force.  (*See* Trial Tr. Vol. II 272:10-273:2 (Officer Ibarra's testimony that Mr. Hoadley's report did not accurately reflect what Officer Ibarra witnessed).)  This interpretation of the evidence is also supported by the trial testimony of Officer Ibarra, who said he reported Mr. Hoadley's use of force to his superior officer, who then conducted a meeting with Mr. Hoadley and Officer Ibarra.  (Trial Tr. Vol. II 222:22-223:7.)  Officer Ibarra testified that at that meeting, Mr. Hoadley told Officer Ibarra, "I

didn't hit him. Do you understand?", which Officer Ibarra understood to mean that he would face repercussions if he continued to report Mr. Hoadley struck B.H. (Trial Tr. Vol. II 223:4-14, 263:7-17.) He also testified Mr. Hoadley instructed him not to write a report on the B.H. incident because Mr. Hoadley was going to write it. (*Id.* 262:23-263:6.) Additionally, because B.H. accused Mr. Hoadley of having punched him at the scene, the jury could reasonably conclude that at the time Mr. Hoadley wrote his report, he was aware of the possibility his use of force may be investigated and was trying to impede, obstruct, or influence the potential investigation.[4] It is also notable that Mr. Hoadley omitted from his report that Officer Ibarra was present at the scene and witnessed the use of force. (Trial Tr. Vol. IV 148:6-12.[5]) Considered together, a reasonable trier of fact could conclude Mr. Hoadley was attempting to avoid having his use of force against B.H. scrutinized in an investigation. Thus, a rational jury could have found the essential elements of Count 2 beyond a reasonable doubt.

At trial, the Defense went to great lengths to discredit Officer Ibarra, and it appears successfully so as to Count 1, of which Mr. Hoadley was acquitted. Nonetheless, it was the jury's duty to judge and weigh Officer Ibarra's testimony, and the different decisions between Count 1 and Count 2 suggests the jury indeed fulfilled this duty. (*See* ECF 85 p. 13 (Jury Instr. 10) (instructing jury it could "believe everything a witness says, or part of it, or none of it").)

Mr. Hoadley argues the jury's finding of guilt on Count 2 is inconsistent with its acquittal on Count 1. (ECF 111 pp. 1-5.) It's first important to recognize that review for an inconsistent

---

[4] Whether Mr. Hoadley knew the investigation might be conducted by a federal agency is not material to the analysis. *See United States v. Gonzalez*, 906 F.3d 784, 795 (9th Cir. 2018) ("The defendant need not know that the matter in question falls within the jurisdiction of a federal department or agency."); (ECF 85 p. 27 (Jury Instr. 24) ("The defendant need not know that the investigation at issue falls within the federal government's jurisdiction.")).
[5] ECF 104.

verdict is different and separate from review for sufficiency of the evidence, which is the review

offered under Rule 29.

> Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. See *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); Fed.Rule Crim.Proc. 29(a); cf. *Jackson v. Virginia,* 443 U.S. 307, 316, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

*United States v. Powell*, 469 U.S. 57, 67 (1984). The Court has already examined Count 2 under

the sufficiency-of-the-evidence standard and found the jury could rationally convict Mr. Hoadley

of Count 2.

Even assuming the jury's acquittal on Count 1 was inconsistent with its conviction on

Count 2, such an inconsistency would not warrant a judgment of acquittal under Rule 29 (or a new

trial under Rule 33).

> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.... For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.

*Id.* at 65. Moreover, the Court does not find the verdicts inconsistent. Based on the evidence

presented at trial, the jury could have rationally concluded that Mr. Hoadley did not actually use

excessive force against B.H. (and therefore acquit him in Count 1) while also rationally concluding

that Mr. Hoadley feared he had used excessive force and falsified his report in an attempt to soften the description of force and influence any potential investigation (and therefore convict him in Count 2). Thus, there is no irreconcilable inconsistency that demands a judgment of acquittal on Count 2.

### 1.2    Count 3 - Witness Tampering

Count 3 charged Mr. Hoadley with violating 18 U.S.C. § 1512(d)(2), which makes it illegal to intentionally harass another person in an attempt to hinder, delay, prevent, or dissuade the person from reporting a possible federal offense to a law enforcement officer. The Government's theory as to Count 3 was that Mr. Hoadley intentionally harassed C.H. in an attempt to dissuade C.H. from cooperating with the FBI's investigation into the use-of-force complaints involving Mr. Hoadley. The essential elements of this charge require the Government to prove beyond a reasonable doubt that Mr. Hoadley intentionally harassed C.H. in an attempt to hinder, delay, or dissuade C.H. from reporting to the FBI a possible federal offense committed by Mr. Hoadley. (ECF 85 p. 28 (Jury Instr. 25)); 18 U.S.C. § 1512(d)(2).

Count 3 centered on Mr. Hoadley's (and Sergeant Bendewald's) meeting on June 29, 2021, with C.H. At the time, Mr. Hoadley was aware the FBI was investigating him (along with other members of the CPD) and, as part of that investigation, the FBI was interviewing CPD officers and personnel. (Trial Tr. Vol. IV 87:16-88:6.) On June 28, 2021 (the day before the meeting with C.H.), an FBI agent informed the CPD chief of police by phone that, while the investigation was still ongoing, certain investigation materials had been forwarded to criminal prosecutors to consider whether to file criminal charges against one or more of the targets of the investigation. (Trial Tr. Vol. III 252:21-253:10.) The FBI agent had previously informed the CPD chief of police that he was not prohibited from relaying any information to the targets of the investigation. (*Id.*

252:11-20.) Thus, the jury could reasonably conclude Mr. Hoadley knew he was being considered for criminal charges based on the FBI's investigation during his meeting with C.H. on June 29, 2021. (*See* Trial Tr. Vol. IV 185:24-186:5 (Mr. Hoadley's testimony that the chief of police had informed him about the FBI's investigation).)

C.H. was a member of the City County Narcotics Unit, which shared officers from the CPD and deputy sheriffs from the Canyon County Sheriff's Office in a joint task force to combat the illegal narcotics trade in the area. (Trial Tr. Vol. III 10:3-11.) During the meeting with Mr. Hoadley and Sergeant Bendewald, C.H. asked that his day-to-day supervisor from the City County Narcotics Unit, a sergeant with the sheriff's office, be present for the meeting, which Mr. Hoadley denied. (*Id.* 20:19-25, 30:12-25; Trial Tr. Vol. IV 79:25-80:13.) C.H. testified Mr. Hoadley instructed C.H. he needed to remember the patch on his sleeve was CPD and not the sheriff's office. (Trial Tr. Vol. III 20:10-18; Trial Tr. Vol. IV 80:20-81:6.) Mr. Hoadley accused C.H. of "acting a certain way towards Sergeant Bendewald because of the FBI investigation," referring to some alleged minor insubordination. (Trial Tr. Vol. III 19:25-20:9, 40:16-20.) C.H. testified at trial he felt this meeting was actually "[a]n ambush" on him, and he felt Mr. Hoadley was insinuating that C.H.'s current position with the City County Narcotics Unit and potentially his career was at risk if he continued to cooperate with the FBI. (*Id.* 21:19-21, 35:17-24, 58:3-9; Trial Ex. 3002 p. 2 ("I felt that Lt Hoadley was threatening me not only with my current assignment at the CCNU but as a potential witness in an ongoing investigation as well.").) C.H. understood Mr. Hoadley was instructing him that he needed to show loyalty to Mr. Hoadley and Sergeant Bendewald in regards to the FBI investigation. (Trial Tr. Vol. III 54:9-19.)

Further, Detective Cardwell testified at trial that Mr. Hoadley showed a cellphone video of himself punching a detained individual in the face to Sergeant Bendewald and C.H. during the

conference in Spokane in 2016. A rational jury could conclude Mr. Hoadley, during the June 29, 2021 meeting with C.H., feared C.H. could report the cellphone video incident to the FBI and was trying to intimidate C.H. into not doing so. (*See* Trial Tr. Vol. I 192:21-193:9 (limiting instruction allowing the jury to consider evidence that Mr. Hoadley allegedly showed a video of himself punching a detainee was admissible for the limited purpose of establishing Mr. Hoadley's motive and intent to intimidate C.H. as part of Count 3).)

Taking this trial evidence altogether and viewing it in the prosecution's favor, a rational jury could conclude that during the June 29, 2021 meeting, Mr. Hoadley intentionally harassed C.H. with veiled threats that C.H. needed to remain loyal to Mr. Hoadley in terms of the FBI investigation, including by not divulging the cellphone video from 2016, or he would face job insecurity, all in an attempt to dissuade C.H. from reporting a possible federal offense to the FBI (or other federal officer). Thus, a judgment of acquittal on Count 3 is not warranted.

### 1.3    Count 4 - Evidence Tampering

Finally, Count 4 charged Mr. Hoadley with violating 18 U.S.C. § 1512(c)(1), which makes it a crime for someone to corruptly alter, destroy, mutilate, or conceal a record, document, or other object with the intent to impair the object's integrity or availability for use in an official federal proceeding. The Government's theory as to Count 4 was that Mr. Hoadley wiped or reset his department-issued cellphone (Trial Ex. 4027) and laptop computer (Trial Ex. 4025) to prevent the data on those devices from being usable in this criminal prosecution. The essential elements of this charge require the Government to prove beyond a reasonable doubt that Mr. Hoadley (1) corruptly altered, destroyed, mutilated, or concealed the data on the cellphone and laptop (or attempted to do so), (2) with the intent to impair its integrity or availability for use in this case, and

(3) this case was either pending or reasonably foreseeable to Mr. Hoadley at the time of his conduct. (ECF 85 p. 30 (Jury Instr. 27)); 18 U.S.C. § 1512(c)(1).

At trial, Mr. Hoadley agreed he reset the cellphone. (Trial Tr. Vol. IV 116:3-5.) He testified that he did so because he wanted to remove his personal information from the cellphone (e.g., his banking information and personal photos), and he expected the cellphone to be reset by the department and issued to a different officer. (*Id.* 116:6-14.) He said he felt he "was doing them a favor just by resetting it to the factory settings so somebody else could use it." (*Id.* 116:12-14.) Mr. Hoadley also agreed he reset the laptop computer to its factory settings (*id.* 121:9-19), but never explained why at trial.

The evidence at trial established Mr. Hoadley knew about this criminal prosecution against him, which constitutes an "official proceeding" (ECF 85 p. 31 (Jury Instr. 28)), at the time he reset the department-issued devices. Indeed, he had been arraigned on the superseding indictment in this case on April 19, 2022 (ECF 18), which was the day before he reset the devices. Additionally, the evidence established his act of resetting the devices altered, destroyed, or concealed the data that existed on the devices, at least some of which concerned activities of Mr. Hoadley's policing.

The primary dispute concerning Count 4 is whether Mr. Hoadley corruptly reset the devices with the intent to impair the integrity or availability of the data on the devices for use in this criminal prosecution. Viewing the trial evidence in the light most favorable to the prosecution, the Court has little difficulty concluding sufficient evidence was presented from which a rational jury could convict Mr. Hoadley of Count 4.

A reasonable jury could discount Mr. Hoadley's explanation that he was just trying to be helpful by clearing the data from the devices. Lieutenant David Wright, who was in charge of assigning and receiving electronic devices at CPD, testified he was surprised the devices had been

reset and stated, "I'd had a lot of equipment turned in to me over the years, and this is the first time I've had anything wiped." (Trial Tr. Vol. III 114:20-25.) He also said that when an officer gets an upgraded phone, the department keeps the officer's old phone for a bit, with the data intact, to make sure the data (including information and contacts) gets properly transferred to the officer's new phone. (*Id.* 100:4-22.) Only when the data has been transferred to the new phone and the department is ready to get rid of the old phone is the data deleted from the old phone. (*Id.*) This is supported by the fact that Lt. Wright still had one of Mr. Hoadley's older department-issued cellphones (Trial Ex. 4028), which Lt. Wright turned over to the FBI as part of its investigation. (Trial Tr. Vol. III 107:25-108:7, 144:7-145:2.) This older cellphone (Trial Ex. 4028) had not been reset by Mr. Hoadley when he turned it in, and the FBI performed an extraction of data on it, which included finding some personal information like instant messages, photographs, notes, etc. (Trial Tr. Vol. III 178:7-180:20; Trial Ex. 1023.) In a similar vein, Jose Menchaca (the IT director) testified that he had hundreds of computers turned in from city employees over his 17 years of employment and Mr. Hoadley's computer was the first time ever that the user had wiped or reset the machine before turning it in. (Trial Tr. Vol. III 162:3-18.) The jury had an ample basis to conclude that Mr. Hoadley's explanation of doing the department a favor by wiping his devices lacked credibility.

Additionally, that Mr. Hoadley wiped the data from his electronic devices becomes even more problematic when considering Count 3 involved an allegedly inculpatory video shown by Mr. Hoadley on a cellphone. The jury could reasonably conclude Mr. Hoadley's true motive for resetting the electronic devices was to delete certain data so it could not be used against him in this case.

Mr. Hoadley's assertion that he was never told he could not delete the data from his electronic devices (ECF 95 pp. 14-15) is no defense to Count 4. The crime of evidence tampering does not say a defendant can only be convicted if they were first told not to tamper with evidence. *See* 18 U.S.C. § 1512(c)(1). Moreover, Mr. Hoadley was a 20-year veteran of the police force and had extensive training on why and how to preserve evidence, which the jury was free to consider and weigh as part of determining whether Mr. Hoadley reset the devices "corruptly," i.e., wrongfully or with an improper purpose (ECF 85 p. 31 (Jury Intr. 28)).

Finally, Mr. Hoadley's argument that the Government failed to prove the data from his electronic devices was unavailable elsewhere, like on a remote server (ECF 95 pp. 15-16; ECF 111 pp. 8-10), is also no defense to Count 4. The crime of evidence tampering does not have as an element that the evidence is unobtainable from a different source. *See* 18 U.S.C. § 1512(c)(1). Indeed, as 18 U.S.C. § 1512(c)(1) expressly allows, the Government alternatively charged Mr. Hoadley with having "attempted" to tamper with evidence (ECF 29 p. 3), and the Court instructed on such at trial (ECF 85 p. 30 (Jury Instr. 27)). In his reply brief, Mr. Hoadley asks, "But was the data altered or destroyed?" (ECF 111 p. 9.) Neither the statute nor the indictment in this case require an affirmative answer for a conviction to stand. Even if the data from the cellphone (Trial Ex. 4027) and laptop (Trial Ex. 4025) was available elsewhere, it would offer no basis for a judgment of acquittal on Count 4.

Considering the evidence in the prosecution's favor, a rational jury could readily find that Mr. Hoadley corruptly altered, destroyed, mutilated, or concealed a record, document, or other object (or attempted to do so) with the intent to impair its integrity or availability for use in this criminal prosecution, which he knew was pending at the time, by resetting his department-issued

cellphone and laptop prior to returning them. A judgment of acquittal on Count 4 is not appropriate.

## 2.   <u>New Trial</u>

As an alternative to his request for a judgment of acquittal, Mr. Hoadley also asks for a new trial. Federal Rule of Criminal Procedure 33(a) allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." It is the defendant's burden to show the interest of justice demands a new trial. *United States v. Alvarez-Moreno*, 657 F.3d 896, 901 (9th Cir. 2011). "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1212 (9th Cir. 1992) (citing 3 Charles Alan Wright, *Federal Practice and Procedure* § 553 at 245 (1982)).

> "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980); accord *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln,* 630 F.2d at 1319.

*Id.* at 1211–12. The decision whether the interest of justice requires a new trial is left in the sound discretion of the trial court, and a new trial is warranted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

Mr. Hoadley contends the interest of justice demands a new trial because less than a week before trial started, the Government disclosed approximately 340,000 bates-stamped documents, and document disclosures continued through trial. (ECF 95 p. 17.) These disclosures came from

the *Garrity* filter team.[6] The FBI's investigation into various CPD officers uncovered and created

a tremendous quantity of documents and records, many of which were emails. (*See* ECF 108 pp.

2-5; Schaefer Decl. ¶¶ 8, 10, 13[7].)  As part of the City of Caldwell's production of records in

response to federal subpoenas, the *Garrity* filter team received a production file containing records

for three former CPD police officers who were not Mr. Hoadley (they were Chief Wyant, Captain

Riley, and Sergeant Bendewald) on September 12, 2022. (Schaefer Decl. ¶ 22.)  This totaled

approximately 340,000 pages of emails. (ECF 108 p. 4.)  The next day, the filter team provided

the Wyant, Riley, and Bendewald production file directly to Defense Counsel without filtering

because trial was set to begin less than a week later on September 19, 2022. (Schaefer Decl. ¶ 23.)

As the *Garrity* filter team had not had a chance to filter the Wyant, Riley, and Bendewald

production file for privileged information, these documents were not provided to the prosecution.

(ECF 108 p. 18.)

        This document dump of some 340,000 pages onto Defense Counsel less than a week prior

to trial was understandably problematic.  It did not leave the Defense enough time to review all

the documents for impeachment purposes or exculpatory information.  On the same day it received

the Wyant, Riley, and Bendewald production file (September 13, 2022), the Defense filed a Motion

to Continue Trial based on the receipt of the production file.  (ECF 65.)  The very next day,

however, the Defense filed a Notice of Withdrawal of Motion to Continue, asserting "Mr. Hoadley

intends to go forward as planned, Monday, September 19, 2022." (ECF 66.)

---

[6] In *Garrity*, the Supreme Court held that where a government employee (like a police officer) was informed of their right to remain silent and threatened with the loss of their job if they exercised it, the employee's answers are deemed compelled and, pursuant to the Fifth Amendment, could not be used against the employee in a criminal prosecution. *Garrity v. New Jersey*, 385 U.S. 493, 497-98 (1967).  The Supreme Court concluded the choice between incriminating oneself and suffering the job loss (or other threatened penalty) was "the antithesis of free choice to speak out or remain silent." *Id.* at 497.  Thus, when a public employee receives a *Garrity* warning, they are subject to the loss of employment (or other threatened penalty) based on their statements, but those statements cannot be used against them in a criminal prosecution.

[7] ECF 108-1.

The day after that, September 15, 2022, the Court held a telephonic hearing on the matter (and other matters).  (ECF 72.)  The Court recounted the documents that had just been produced to the Defense and noted that it was prepared to grant a continuance if Mr. Hoadley felt the ends of justice required it.  (*See* Tr. of Tele. Motion Hrg 4:15-17[8] (the Court noting that "it creates a situation that I see that potentially requires either a continuance or a decision by the Defense in this matter to proceed as scheduled").)  During that hearing, Defense Counsel confirmed with Mr. Hoadley, who was present with Defense Counsel at the hearing, that Mr. Hoadley did not want a trial continuance and wanted to proceed to trial as scheduled.

> THE COURT:        Mr. Peterson, does your client wish to seek a continuance or wish to go forward with this matter?
> MR. PETERSON:     Mr. Hoadley desires to go ahead.

(*Id.* 13:1-3.)

It was Mr. Hoadley's decision to press the trial as scheduled, and the decision was both a reasonable trial strategy (because it prevented the prosecution from having the opportunity to review those same thousands of documents) and an understandable choice in light of his life and employment circumstances (*see id.* 9:15-21).  But his current argument that the interests of justice now require a new trial based on the late production of the Wyant, Riley, and Bendewald documents falls flat.  Mr. Hoadley was adamant that his trial begin on September 19, 2022 as scheduled.  And after presiding over four days of evidence and argument conducted by very capable counsel on both sides, along with nearly two days of jury deliberations, this Court is not of the opinion that a serious miscarriage of justice may have occurred that would warrant a new trial.  Therefore, Mr. Hoadley's motion for a new trial under F.R.Cr.P. 33 will be denied.

---

[8] ECF 100.

## CONCLUSION AND ORDER

Having considered the trial evidence in the light most favorable to the prosecution, the Court concludes a rational jury could have found the essential elements of Counts 2, 3, and 4 beyond a reasonable doubt, and therefore Mr. Hoadley cannot prevail on his motion for judgment of acquittal under Rule 29.   Additionally, having considered the issues surrounding the large production of documents shortly before trial and the trial as a whole, the Court concludes the interests of justice do not require Mr. Hoadley be granted a new trial under Rule 33.

**IT IS THEREFORE ORDERED** that the Defendant's Renewed Motion for Judgment of Acquittal or in the Alternative, for New Trial (ECF 95) is hereby **DENIED**.

**DATED:** November _17th_, 2022.

Scott W. Skavdahl
United States District Judge